IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

MARK LYNN JEFFREY,

      Petitioner,

v.                                  Case No. 1:17-cv-03021

DONNIE AMES, Superintendent,
Mount Olive Correctional Complex,

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable David A. Faber, Senior United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** Petitioner's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 and **DISMISS** this civil action from the docket of the court.

## RELEVANT PROCEDURAL HISTORY

After his first trial resulted in a mistrial, on November 3, 2011, Petitioner was found guilty by a jury in the Circuit Court of Mercer County of two counts of Purchasing a Child (Counts One and Two); three counts of Sexual Abuse in the First Degree (Counts Three, Five, and Seven); four counts of Sexual Abuse by a Custodian (Counts Four, Six, Eight, and Ten); and one count of Sexual Assault in the First Degree (Count Nine). *State v. Mark Lynn Jeffrey*, Case No. 10-F-91-DS (Mercer Cty. Cir. Ct.). The charges stemmed from the claim that Petitioner offered $15,000 to $20,000 to his daughter-in-law, Sylvia, to

purchase custody of his granddaughters, A.A. (then four years old), and K.J. (then two years old), and had sexually abused and assaulted his step-granddaughter, A.P.[1]  On January 23, 2012, Petitioner was sentenced to an effective term of imprisonment of 15-45 years.  Throughout his trial court proceedings, Petitioner was represented by attorney Robert Holroyd.

Petitioner's judgment was affirmed by the Supreme Court of Appeals of West Virginia (the "SCAWV") on June 24, 2013.  *State v. Mark Lynn J.*, Case No. 12-0272, 2013 WL 3185087 (W. Va. June 24, 2013).  (ECF No. 10, Ex. 5).  Petitioner then filed a petition for a writ of habeas corpus in the Circuit Court of Mercer County.  *State ex rel. Jeffrey v. Ballard*, Case No. 13-C-431 (Mercer Cty Cir. Ct.).  Subsequently, attorney Paul R. Cassell was appointed to represent Petitioner and an amended petition was filed.  Following briefing and an omnibus hearing, the circuit court denied Petitioner's amended habeas corpus petition on September 22, 2015.  (ECF No. 10, Ex. 11).

The SCAWV affirmed the denial of Petitioner's circuit court habeas corpus petition on February 21, 2017.  S*ee Mark Lynn J. v. Ballard*, No. 15-1034, 2017 WL 700852 (W. Va. Feb. 21, 2017) (*Id.*, Ex. 14).  The habeas appeal addressed only Petitioner's claims of ineffective assistance of counsel, disproportionate sentence, and cumulative error.

On May 24, 2017, Petitioner filed the instant Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1).  On March 21, 2019, Judge Faber entered a Memorandum Opinion and Order finding that Petitioner had only exhausted his state court remedies with respect to grounds 5 and 6 of his § 2254 petition.  (ECF No. 16). Petitioner elected to sever the unexhausted claims and proceed only on the exhausted

---

[1] A.A. and K.J. are the children/step-children of Petitioner's son Kirby Jeffrey and his estranged wife (now ex-wife) Sylvia Anderson.  A.P. (and C.R, who will be disucssed *infra*) are the children/step-children of Petitioner's son Kevin Jeffrey and his wife, April.

claims. (ECF No. 13). Those claims, which contain additional sub-parts that will be addressed as necessary *infra*, are as follows:

> 5.  Petitioner's due process rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated when his attorney provided ineffective assistance of counsel.
>
>> (a)  Trial counsel was ineffective in failing to seek severance of charges.
>>
>> (b)  Trial counsel was ineffective with regard to *voir dire*.
>>
>> (c)  Trial counsel was ineffective in addressing the testimony of play therapist Phyllis Hasty.
>>
>> (d)  Trial counsel was ineffective with regards to exhibits demonstrating the ongoing custody issues (Defs. Exs. 1 and 2).
>>
>> (e)  Trial counsel was ineffective in permitting irrelevant or inadmissible evidence before the jury.
>
> 6.  Petitioner's due process rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated by the cumulative effect of the errors during the course of his representation at trial level.

(ECF No. 1 at 19-23).

On January 13, 2020, Respondent, by counsel, filed a Response to the Petition addressing the merits of grounds 5 and 6 and asserting that Petitioner's § 2254 petition should be denied in its entirety. (ECF No. 24). On April 3, 2020, Petitioner filed a reply brief. (ECF No. 26). This matter is ripe for adjudication.

<u>**SUMMARY OF RELEVANT EVIDENCE**</u>

**A.    Pre-trial hearing on Rule 404(b) evidence.**

Before trial, "[t]he State informed the trial court and [P]etitioner that it wished to offer evidence of inappropriate touching of A.P.'s sister, C.R., and additional evidence from A.P. to establish that [P]etitioner had illicit purposes in attempting to purchase A.A.

and K.J." *State v. Mark Lynn J.*, 2013 WL 3185087 at *1. "The trial court conducted a Rule 404(b) hearing and ruled that this evidence would be permitted to show petitioner's lustful disposition toward children and the absence of mistake." *Id.* (ECF No. 24 Exs. 1 and 2).

### B.    Jury *Voir Dire*.

During *voir dire*, "several prospective jurors indicated their skepticism about their ability to find a defendant guilty of a crime based solely on the uncorroborated testimony of a child." *Mark Lynn J. v. Ballard*, No. 15-1034, 2017 WL 700852, at *1 (W. Va. Feb. 21, 2017). "Noting that the law allows for a guilty verdict based on such evidence, the circuit court excused the prospective jurors from further service." *Id.* (ECF No. 24, Ex. 2 at 17-19; 28; 33-36; 58).

### C.    Trial Testimony.

Sometime in 2006, Christopher Bell, a supervisor with the Child Protective Services ("CPS") division of the West Virginia Department of Health and Human Resources ("DHHR"), received a complaint from Petitioner regarding child abuse or neglect relating to his grandchildren, A.A. and K.J. (ECF No. 24, Ex. 3 at 116-17). Petitioner contended that his daughter-in law, Sylvia (the children's mother) was "masturbating in front of a computer and a child was in the background." (*Id.* at 118). Bell explained that "even though the initial allegations that c[a]me to our attention were masturbating in front of the computer, we assess for safety based upon home conditions, living environment, hostile people in the home. So we don't just focus on what the original call was. We look at all aspects of child safety." (*Id.* at 119).

In accordance with CPS protocol, Bell visited the children and observed that they were mostly clean, well-cared for, that the home appeared safe, and there was no evidence

that they were living in substandard conditions. (ECF No. 24, Ex. 3 at 122). Therefore, he concluded that there was no evidence of abuse or neglect. (*Id.* at 125). Thereafter, the allegation that Sylvia was masturbating on the internet in front of a child was referred to the police and the prosecutor's office, who, after reviewing a video provided by Petitioner, determined that no crime had been committed. (*Id.* at 111).

Sylvia testified that, on December 12, 2006, Petitioner arrived at her house with a briefcase, "opened it and it had a large amount of money in it. And he offered me the money for my daughter, A[.]A[.]"[2] (*Id.* at 141-143). She stated that Petitioner offered her a total $20,000—$15,000 of which was in the briefcase and the remaining $5,000 that he would get from a nearby bank. (*Id.* at 143-44). When Petitioner left to retrieve the additional $5,000, Sylvia called the police, who came to her home and arrested Petitioner upon his return. (*Id.* at 146-47).

On cross-examination, Holroyd questioned Sylvia about an alleged agreement between herself and Petitioner and Kathy Jeffrey to transfer custody of both children to Petitioner and Kathy. Holroyd introduced Defendant's Exhibit 1, which was purported to be a written agreement (contract) allegedly executed by Sylvia, agreeing to transfer custody of the children to Petitioner and Kathy. However, on the stand, Sylvia denied signing that document and claimed that she had never seen it before. (*Id.* at 146-50). Sylvia also denied the placement of her signature on Defendant's Exhibit 2, which was an agreement to allow Petitioner and Kathy visitation rights with the children for a payment of $500. (*Id.* at 150-51). However, she did testify about allowing Petitioner and Kathy to

---

[2] There is some discrepancy in the evidence about whether Petitioner was attempting to purchase just A.A., the older child, who had some cognitive difficulties, or both A.A. and her younger sister, K.J. Petitioner was charged with attempting to purchase both children, and he admitted that he was attempting to obtain both children. Thus, there was evidence to support his conviction on both counts.

visit and care for her children, sometimes even permitting them to take trips with Petitioner and to stay with him for several weeks at a time. (*Id*. at 151-52).

Holroyd further cross-examined Sylvia about Petitioner's contention that she had engaged in sexual conduct on the computer in front of one of the children and the complaint that Petitioner had filed concerning that conduct. Sylvia acknowledged that she had once engaged in such conduct while on the computer with her ex-husband, Kirby, but stated that she stopped when their daughter, who was sleeping on the bed, woke up. (*Id*. at 152-54).

West Virginia State Trooper Cpl. James Long testified that, on December 12, 2006, he responded to a complaint by Petitioner's daughter-in-law, Sylvia, that Petitioner was trying to purchase his grandchild. (ECF No. 24, Ex. 3 at 156-57). Long met Petitioner at Sylvia's home and found Petitioner in possession of cash and a cashier's check for approximately $15,000. (*Id*. at 157-58).

Long placed Petitioner under arrest and administered a Miranda warning. (ECF No. 24, Ex. 3 at 158). At that time, Petitioner admitted that he was there to buy his two grandchildren for the sum of $20,000, but Sylvia rejected his offer. (*Id*. at 158, 160). The State introduced into evidence a copy of the money and cashier's check, which totaled $20,000. (*Id*. at 163). Long stated that Petitioner never indicated that Sylvia had signed over custodial rights of the children or anything to that effect. (*Id*. at 164-65). Long asked Petitioner why he was attempting to purchase the children and Petitioner said: "Because the children live in sub-standard conditions. They are neglected. I could give them a better life." (ECF No. 24, Ex. 3 at 160-61). Long further testified that, as a mandatory reporter of abuse and neglect, he inspected the home and living conditions and concluded that the children were not neglected or living in substandard conditions. (*Id*. at 165).

6

Holroyd cross-examined Long at length about Petitioner's allegation concerning Sylvia engaging in sexual and pornographic conduct in front of the children in order to develop Petitioner's position that his desire to purchase his grandchildren was an attempt to remove them from the substandard conditions and neglect, and not because he was sexually attracted to them. (*Id.* at 169-71). Long testified that the allegations that the mother was masturbating on the internet had nothing to do with his investigation concerning Petitioner's attempt to purchase his grandchildren, which was a violation of West Virginia law. (*Id.*)

One of the victims, A.P., who was then 13 years old, testified that Petitioner—her grandfather—touched her between March 2007 and January 2008. (*Id.* at 193, 195).[3] A.P. explained that this generally happened when they were together in his car, at his brother's house, or at her house when her parents were not home. (*Id.* 196, 199). A.P. testified that, while in the car, "[h]e would have me sit in the passenger s[e]at, he would make me unbutton my pants and he would just touch me." (*Id.* at 196). "He would have me just lay down" and "[h]e would put his hand down my pants." (*Id.* at 198). A.P. further testified that Petitioner penetrated her vagina with his finger and fondled her breasts. (*Id.* at 198-99). Petitioner told A.P. not to tell anyone. (*Id.* at 200-01). A.P. stated that Petitioner also French-kissed her. (*Id.* at 201).

C.R., A.P.'s sister, who was then 12 years old, also testified. (ECF No. 24, Ex. 3 at 182). C.R. testified that, around 2008, when she was eight or nine years old, Petitioner tried to kiss her with his tongue and also touched her breasts. (*Id.* at 183-86). He also touched her on her thigh, near her privates, but did not actually touch her privates. (*Id.*

---

[3] A.P. testified that the abuse began while she was in the third grade and ended when she was in the fourth grade. (ECF No. 24, Ex. 3 at 207).

at 186). C.R. ultimately told her mom about this unwanted contact, because Petitioner was scheduled to babysit her and her sister while their parents went on a trip, and it made her uncomfortable. (*Id.* at 187). C.R. also saw Petitioner try to touch A.P. "where you shouldn't touch people." (*Id.* at 189). She also saw him kiss her on the lips. (*Id.* at 189). Following C.R.'s testimony, the trial court gave the following instruction to the jury concerning the admissibility and use of C.R.'s testimony:

> You have heard the evidence concerning the alleged conduct or act of the Defendant with C.R. . . . which is not charged in the Indictment in this case. You are instructed that such evidence is not admitted as proof of the Defendant's guilt on the present charges involving A.P. [ ] This evidence is admitted for a limited purpose only, and it may be considered by you only in deciding whether a given issue or element relevant to the present charges have been proven.

> In this instance, the evidence may not be considered as proof of the charges contained in the Indictment. The Defendant is not now being tried for any of the specific acts to which this evidence relates, and you should bear this fact definitely in mind. Such evidence was admitted and should be considered by you only so far as, in your opinion, it may go to show [t]he absence of mistake or inadvertence, common scheme, plans and design, and the lustful disposition of the Defendant.

> You may not use this evidence in consideration of whether the State has established the crime charged in the Indictment, in addition, such evidence is not relevant to any other matters, such as the character of the Defendant, whether the Defendant is a bad person or whether the Defendant had the propensity or the disposition to commit the crime charged. This evidence may not be considered in that regard, since the Defendant's character is not an issue. In addition, it is not proper for the State to prove a criminal case by evidence that a defendant may have committed other criminal actions or may be a bad person.

> Accordingly, this evidence may be considered by you only for the limited purpose for which it has been admitted.

(*Id.* at 192-94).

April Jeffrey, A.P. and C.R.'s mother, testified that, at some point, she told her children that Petitioner would be watching them while she and her husband went away

for a few days to celebrate their anniversary. (ECF No. 24, Ex. 3 at 215-17). She stated that C.R. started crying and disclosed to her that Petitioner was touching A.P. (*Id.* at 217).

Kevin Jeffrey, Petitioner's son, and the father/step-father of C.R. and A.P. testified that Petitioner would often come, many times without Kathy, from Tennessee to West Virginia to visit his children and grandchildren, and that he would often babysit the girls. (*Id.* at 209-211). Kevin also confirmed that, on December 12, 2006, Petitioner came to his house and stated that he had $20,000 and that he was going to try to "buy" A.A. from Sylvia. (*Id.* at 212-13).

West Virginia State Police Sgt. Melissa Clemons, who was assigned to the Crimes Against Children Unit, testified that she was assigned to investigate the allegations of sexual abuse of A.P. and C.R. Sgt. Clemons stated that she observed forensic interviews of the girls on February 14, 2008, at Child Protect, a child advocacy center. (*Id.* at 219-23). Counseling services were offered as part of the CPS investigation, and the children were referred to child therapist Phyllis Hasty, by Child Protect. (*Id.* at 224-25).

On the second day of trial Phyllis Hasty ("Hasty") testified about her treatment of the children, using play therapy techniques. (ECF No. 24, Ex. 4 at 5-42). During her direct examination by the prosecutor, Hasty was being questioned about how she learned of the children's disclosures of sexual abuse in this case. In the course of that testimony, Hasty stated that statistics "show that only two to six percent of those children ever lie about sexual abuse." (*Id.* at 10). Holroyd's objection to this opinion testimony was sustained and the jury was instructed as follows:

> I want you to disregard any testimony about percentages, credibility et cetera, of witnesses. That's not for anybody but you to determine. You determine the facts from this case as to the credibility of these witnesses and not from any opinions anybody has about credibility of other folks. So with that, strike that from [ ] the record and strike that from your mind.

(*Id.* at 11).  Hasty then testified to what A.P. told her about the sexual abuse during the course of their treatment.  (*Id.* at 13-14).  Holroyd's hearsay objection was overruled because the statements were made during the course of Hasty's treatment of A.P.  (*Id.* at 14).  Hasty also offered her opinion that children do not have good recall of specific dates, but are able to associate things that happened in relation to holidays, special occasions, or specific events.  (*Id.* at 18-19).

Hasty testified that A.P. disclosed to her that Petitioner had touched her "boobs" and vagina (which she called her "kitty-coo"), and that he put his fingers inside her, kissed her on her mouth, and made her touch his privates with her hand.  (*Id.* at 19).  A.P. told her that these incidences occurred in her home, in a car parked in a Wal-Mart parking lot, and in Petitioner's brother's apartment in Tennessee. (*Id.*)

The prosecutor asked Hasty her opinion about whether A.P. was coached to say these things.  (*Id.* at 20).  The trial court sustained Holroyd's objection and prohibited Hasty from providing her opinion.  (*Id.* at 20-21). However, the court allowed her to answer a far more limited version of the question—whether, in the course of her treatment, A.P. exhibited signs that she had been coached, which she denied.  (*Id.* at 21-22).  Hasty stated that A.P. exhibited behaviors and used terms that were consistent with a child who had suffered abuse, and that she had no motivation to lie.  (*Id.*)

Hasty further stated that C.R. had disclosed that Petitioner "touched her in the living room over the top of her clothes."  (*Id.* at 26).  The trial court overruled Holroyd's objection to this line of questioning.  (*Id.* at 26).  C.R. also disclosed to Hasty that Petitioner "would rub her between the legs"—"in the thigh area." (*Id.* at 26-27).  Following

Hasty's testimony, the trial court read the same 404(b) limiting instruction regarding the use of C.R.'s disclosures outlined above. (*Id.* at 27-29).

On cross-examination, Holroyd impeached Hasty using her previous testimony concerning the number of sessions needed to effectively treat a sexually abused child. (ECF No. 24, Ex. 4 at 32-33). Holroyd was able to obtain Hasty's concession that these children only attended three therapy sessions, and he used that testimony to argue to the jury that Hasty's opinions were not supported by sufficient evidence-based treatment. (*Id.* at 30-33).

Following Hasty's testimony, the State rested. Holroyd moved for a judgment of acquittal claiming that the State's evidence was insufficient. (*Id.* at 43). Holroyd also moved for a mistrial because Hasty's testimony was not "treatment-based" as the children only saw her for three sessions and she testified that she needed at least eight or ten sessions in order to providing meaningful treatment. (*Id.* at 44). The court denied both motions. (*Id.* at 32).

The defense called Petitioner's brother-in-law, James Morgan, who testified that Petitioner never did anything inappropriate to or around any children. (ECF No. 24, Ex. 4 at 53-56). The defense also called Kathy Jeffrey, Petitioner's wife, who testified that Petitioner loves children and routinely took care of his grandchildren for weeks at a time. (*Id.* at 57-59). Kathy claimed that the girls' living conditions were poor and that she and her husband decided to offer to purchase them if Sylvia, would accept the money. (*Id.* at 60-61). Kathy testified that Petitioner obtained the money to purchase the kids and that she supported that decision. (*Id.* at 61). She denied that Petitioner had ever engaged in any sexual misconduct with any children. (*Id.* at 61-62).

Holroyd asked Kathy whether Sylvia ever offered to let Petitioner and Kathy have the children and whether they had ever created paperwork to that effect. (*Id.* at 64). Defense counsel tendered Defendant's Exhibit No. 1, a document reflecting the transfer of custodial rights to the Petitioner allegedly signed by Sylvia. (*Id.* at 64-65). The State objected to its admission on the basis that Sylvia had denied signing the agreement. (*Id.* at 65). The court allowed Holroyd to continue questioning Kathy to see whether a basis existed to admit the document. (*Id.* at 66).

Holroyd asked Kathy whether she recognized the document and Kathy said: "Yes. One of the boys that she took off with, the mother is the one that fixed this and got her to sign it." (*Id.* at 66). However, Kathy then stated that she did not see Sylvia sign that document. (*Id.*) Given this exchange, Holroyd informed the Court, "All right. I'm not moving this admission at this time, Judge." (*Id.* at 67).

Kathy then testified that she did witness Sylvia execute the visitation agreement contained in Defendant's Exhibit 2, and that she and Petitioner paid the $500 referenced therein, so that they could have visitation rights with their grandchildren. (*Id.* at 67-68). Kathy further testified that Sylvia grew angry at Petitioner when he reported to the police that she was exposing herself on the internet in close proximity to the children. (*Id.* at 69-70). On cross-examination, Kathy admitted that she and Petitioner agreed to buy the grandchildren for $20,000 and had even discussed borrowing money to do so. (*Id.* at 81-82).

Petitioner testified at his trial. He stated that, as soon as he turned the masturbation video over to the police, Sylvia got mad and would not let him or Kathy see their grandchildren. (*Id.* at 86-87). He told the jury that he offered to "just buy the children from" Sylvia. (*Id.* at 92). Petitioner stated that he offered to buy the children

because "[t]hey were being exposed to pornography, for one" and he had seen Sylvia "verbally abuse" them. (*Id.*)  He explained that he was trying to "[g]et them out of there and give them—I was trying to give them a better life.  Raise them myself." (*Id.* at 93). Petitioner testified that "I wanted to purchase both of them." (*Id.* at 119).

Petitioner stated that he did not intend to engage in any criminal activity in attempting to purchase the children and denied sexually assaulting or abusing them. (*Id.* at 94).  He denied all of the allegations made in the indictment and claimed that A.P. was paid to make them up. (*Id.* at 94-97).

### D.    Omnibus Hearing Testimony.

During the omnibus hearing, Petitioner and Kathy Jeffrey testified concerning the alleged deficiencies in Holroyd's representation that they believe led to Petitioner's conviction and their alleged failure to understand Holroyd's trial strategy. (ECF No. 24, Ex. 5 at 20-53).  In particular, Petitioner testified that it was "up in the air" about whether he would take the stand to testify at trial.  The Jeffreys also stated that they did not understand why Holroyd did not call Petitioner's other son, Keith, who had testified at the first trial, or some additional witnesses who could have offered evidence that the child victims had been coached to make their abuse allegations. (*Id.*)

Petitioner also questioned why Holroyd did not attempt to sever the child purchasing charges from the sexual abuse charges. (*Id.* at 25-26).  Kathy Jeffrey also testified that there were additional witnesses who could have offered evidence concerning Sylvia's behavior and the conditions of the home in which the children were living, as well as the behavior of the children and evidence of their lying and having been coached, that would have bolstered Petitioner's defense, and that they had advised Holroyd about this potential evidence. (*Id.* at 38-47).

Holroyd testified that he and the Jeffreys had "a long discussion on more than one occasion about what witnesses to bring in." (ECF No. 24, Ex. 5 at 58). He met with Petitioner and Kathy on numerous occasions leading up to trial. (*Id.* at 57-58). Holroyd said that, "[i]t's always been my observation that too many defense counsel assist the prosecution by putting witnesses on that don't really help the issue but make them subject then to inquiry from the prosecution." (*Id.* at 59). His decision about which witnesses to call was a trial strategy decision based upon his conversations with Petitioner and Kathy (who was "very involved in these matters"). He stated that he also had "numerous telephone conversations, letters back and forth and so forth" with the Jeffreys." (*Id.* at 59). Holroyd testified that he believed Petitioner understood the trial strategy. (*Id.*) In fact, after Petitioner's first trial resulted in a hung jury, "they were thrilled, both of them." (*Id.* at 60).

Holroyd stated that, following the hung jury, he asked the Jeffreys if there were any additional witnesses they wanted to call at the second trial and "they seemed very please[d]." (*Id.* at 60). Although he testified at the first trial, Holroyd decided not to call Petitioner's son, Keith, to testify at the second trial because "[h]is testimony did not add anything to the specific charges here, more of a character type thing," and Holroyd did not believe the testimony would be useful. (*Id.* at 60-61).

Holroyd was also asked why he did not retain an expert to rebut Hasty's testimony. He explained:

> Q:    [W]hy didn't you call an expert to contradict Ms. Hasty's testimony?
>
> A:    . . . . You get into a fight between two or three experts, then all you're going to do is open more and more doors and create more confusion. In this particular case I did not see it to be an advantage to doing it.

14

> Q:    Is that because you had the victim saying nothing happened and then the play therapist saying something did?
>
> A:    Absolutely. Absolutely . . . It wouldn't help at all.

(*Id.* at 62-63).

Regarding the alleged signed contract for custody of the children, Holroyd admitted that he did not retain an expert witness to identify Sylvia's handwriting, but noted that testimony that Sylvia agreed to sell the children to them was still introduced to the jury through Kathy and Petitioner's testimony.  (*Id.* at 63-64).  Additionally, the second signed agreement (regarding the $500 for visitation rights) was introduced at trial.  (*Id.* at 64).

Holroyd further testified, "I didn't see anything about either of the juries that gave me any right to raise an objection . . . . And the client was sitting there with me, we discussed each one of them as we went along and arrived at the selected process." (*Id.* at 65).  Holroyd emphasized that Petitioner do not ask him to strike any particular juror who remained on the jury.  (*Id.* at 65-66).

Concerning the evidence offered to support that Petitioner had a lustful disposition towards children, Holroyd stated:

> [Petitioner]'s explanation for that was that the intent he had there was to save [his grandchildren]. And there was some evidence that they were being neglected and mistreated and that he was a loving grandfather that wanted to help his grandchildren. And he came off, I thought, on the witness stand very much in that mode.

(*Id.* at 70).

## ANALYSIS

### A.    Ineffective assistance of counsel claims.

The bulk of Petitioner's claims for relief are grounded in the alleged ineffective assistance of his trial counsel, Robert Holroyd.  In *Strickland v. Washington*, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel.  A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 687-91.  Moreover, "judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard." *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997).

In reviewing a trial counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance, *id.* at 689, and the burden is on the petitioner to show prejudice.  *Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983).  Further, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690. Additionally, a petitioner may not merely speculate about potential prejudice but must "affirmatively prove" that the result of the proceedings would have been different but for the deficient performance of trial counsel.  *See Strickland*, 466 U.S. at 693.  The undersigned will address each of Petitioner's claims of ineffective assistance of counsel under this standard.

1.    Failure to seek severance of charges.

Petitioner first claims that his counsel provided ineffective assistance because he failed to seek severance of the child purchasing charges from the sexual abuse and assault charges for trial and that trying those charges together unconstitutionally prejudiced his defense.  Specifically, his petition states:

> Petitioner's trial involved two separate and distinct alleged offenses. First, it was alleged that Petitioner attempted to purchase his grandchildren from their mother on or about December 12, 2006. Second it was alleged that Petitioner sexually abused a child between March 2007 and February 2008. The two incidents had nothing to do with each other and involved different victims. Despite the facts that the Trial Court expressed reservations about trying the case together, trial counsel never requested to sever and have two different trials.

(ECF 1 at 19).

Respondent, on the other hand, contends that, in denying this claim, the SCAWV properly applied the *Strickland* standard and found that counsel's performance was not deficient or objectively unreasonable because there was a basis to try the charges together and, thus, a motion to sever would not have been granted.   (ECF No. 24 at 26). Respondent's response further states:

>  "A defendant is not entitled to relief from prejudicial joinder pursuant to Rule 14 of the West Virginia Rules of Criminal Procedures when evidence of each of the crimes charged would be admissible in a separate trial for the other." Syl. Pt. 2, *State v. Milburn*, 204 W. Va. 203, 511 S.E.2d 828 (1998). That this standard applied to the admissibility of the evidence in Petitioner's case is confirmed by a review of the SCAWV's decision in both Petitioner's direct appeal and the appeal of the denial of habeas corpus petition.  In his direct appeal, Petitioner challenged the introduction of Rule 404(b) evidence—that Petitioner sexually assaulted his granddaughter, C.R.—on the basis that it was not admissible against either charge. (Ex. 4 to ECF 10). The SCAWV rejected this claim, finding Rule 404(b) evidence was admissible at trial as to both counts—including the charge that Petitioner was attempting to purchase his grandchildren. *State v. Mark Lynn J.*, 2013 WL 3185087 at *2.  [Footnote omitted].

(*Id.*)

Petitioner's reply brief emphasizes that the alleged sexual abuse victims involved in his case are not the same grandchildren that he was accused of attempting to purchase, and he further points out that the abuse charges arose nearly a year after the incident giving rise to the child purchasing charges and had no commonality beyond the State's allegedly trumped-up motive. Thus, Petitioner contends that federal and state law supported the separation of those charges. (ECF No. 26 at 4-5). Specifically, he says, "courts cannot prejudice a criminal defendant by joining indictments for a single trial simply to allow the state to establish an inflammatory motive especially when the motive is non-existent." (*Id.* at 5). He further asserts:

> Trial counsel's failure to seek severance became unreasonable when it was learned that the State was contending that the sexual abuse was the motivation for the Petitioner attempting to buy the children. The State's theory of motive was deeply flawed by the fact that: (1) there was no evidence of Petitioner sexually abusing the victims in the purchasing incident; (2) the alleged sexual abuse of the other child allegedly occurred **after**, not before, the supposed attempt to purchase the children; and (3) even the 404(b) evidence from C.R. about Petitioner's alleged abuse revealed that the abuse occurred after the purchasing allegations.

(*Id.* at 6). Accordingly, Petitioner contends that the joinder of the charges was premised on the "bare assertions" of the prosecutor that Petitioner was attempting to buy his two grandchildren for illicit purposes, without any evidentiary support of a common scheme, and that, had Petitioner sought a severance, the trial court likely would have granted it. (*Id.* at 7). Therefore, Petitioner claims that he was "clearly and obviously prejudiced." (*Id.* at 7-8).

In his habeas appeal, the SCAWV adopted the following findings of the circuit court:

> (13) The Court FINDS that the [SCAWV] indicated that a severance of the charges contained in Count 1 and 2 of the indictment from those contained in Count 3 through 10 was not required, in that it found the evidence of the

18

Petitioner's inappropriate touching of [C.R.] to have been properly admitted under Rule 404(b) of the West Virginia Rules of Evidence. (See Memorandum Decision)

(14) The Court FINDS that the very heart of the State's case was that the Petitioner attempted to purchase his grandchildren from their mother in an effort to have additional opportunities to have sexual contact with small children, which was the gravamen of the charges contained in Counts 3 through 10 of the indictment.

(15) The Court FINDS that these cases fit exactly within the law of this state that defendants are not entitled to relief from prejudicial joinder when evidence of each of the crimes charged would be admissible in separate trials for the other.

(ECF No. 10, Ex. 11 at 97-98). Consequently, the circuit court further found that it was not unreasonable for Holroyd not to move to sever the charges and that he cannot show the requisite prejudice therefrom. (*Id.* at 99).

Upon an exhaustive review of the record, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the state courts' findings were contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts presented in the state court proceedings. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Petitioner is not entitled to habeas corpus relief on this claim.

2.    Ineffective assistance during jury selection.

Petitioner further contends that Holroyd provided ineffective assistance at trial because he allowed the trial court to strike, for cause, three potential jurors who expressed that they would not be able to decide the case based solely upon the uncorroborated testimony of a child victim, without making any attempt to rehabilitate them before striking them. Petitioner contends that this failure resulted in a jury consisting of those

who would render a guilty verdict based solely on the uncorroborated testimony of the victim.  (ECF No. 1 at 19).

Respondent addresses this claim as follows:

Petitioner's claims easily fail to pass muster.  First and foremost, Petitioner has no right to [a] "favorable" jury. Instead, a criminal defendant is constitutionally entitled to a fair and impartial jury.  *See Witherspoon v. State of Ill.*, 391 U.S. 510, 518 (1968) (explaining that a criminal defendant is entitled to an impartial jury under the Sixth and Fourteenth Amendment); *see also Duncan v. Louisiana,* 391 U.S. 145, 149 (1968); *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due Process requires that the accused receive a trial by an impartial jury free from outside influence."). *State v. Peacher,* 167 W. Va. 540, 552, 280 S.E.2d 559, 569 (1981) ("A fair trial . . . requires a fair and impartial jury.").  The process of voir dire safeguards those rights.  Indeed, "[t]he 'essential function of voir dire is to allow for the impaneling of a fair and impartial jury[.]'" *United States v. Brown,* 799 F.2d 134, 135-36 (4th Cir. 1986) (citations omitted); *Peacher,* 167 W. Va. at 552, 280 S.E.2d at 569 ("The purpose of voir dire is to assure that the defendant's right to a jury free of interest, bias or prejudice is protected and effectuated.").  Thus, Petitioner's claims fail in the first instance—he has no right to insist on having a jury of "favorable" jurors and therefore his counsel could not have been ineffective.

(ECF No. 24 at 28-29).  Respondent further emphasizes that jurors have an obligation to follow the law and the instructions given to them, and the trial court must ensure that any jurors who cannot be impartial are removed from consideration for jury service.  Thus, as noted by Respondent:

The circuit court struck three jurors who indicated they would be reluctant to vote in favor of convicting a defendant where the State's case was predicated upon the uncorroborated testimony of the victim.  In other words, it struck three jurors who evinced their inability to follow the law.  It is entirely proper to strike a juror in this scenario—they are expected to follow the law.  Consequently, Petitioner's trial counsel performance— failing to challenge the trial court's decision to strike these jurors—was not objectively unreasonable because such a challenge could not have been effective.  For the same reasons, Petitioner was not prejudiced by the dismissal of these prospective jurors—a fair, impartial jury was sat (and Petitioner does not argue otherwise).  [Footnote omitted].

(*Id.* at 30).

Petitioner's reply incorrectly asserts that "the State's obvious targeting of potential favorable jurors for preemptive strikes in Petitioner's case is akin to targeting black jurors when the defendant is black." (ECF No. 26 at 9). He further states that "the simple fact is that the State and the Court were permitted, unchallenged by Trial Counsel, to systematically eliminate any juror who expressed even an inkling of concern about accepting testimony of a young child as the gospel." (*Id*.)

As noted by Respondent, the Sixth and Fourteenth Amendments entitle a criminal defendant to an <u>impartial</u> jury. *See Duncan v. Louisiana,* 391 U.S. 145, 149 (1968); *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due Process requires that the accused receive a trial by an impartial jury free from outside influence."). Additionally, state evidentiary law permits the conviction of a defendant on circumstantial evidence, as well as the uncorroborated testimony of a child victim. Thus, the circuit court judge permissibly struck, for cause, and not peremptory challenges by the State, jurors who indicated that they likely could not follow the law and instructions of the court as required. The state courts found that "there was no irregularity in the *voir dire* process that could have contributed to a jury reaching a different result, particularly in light of the direct evidence of the commission of all the crimes by the Petitioner as presented by the witnesses who testified at trial . . . ." (ECF No. 10, Ex. 11 at 98).

Upon an exhaustive review of the record, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the state courts' findings were either contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts presented in the state court proceedings. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Petitioner is not entitled to habeas corpus relief on this claim.

3.    Ineffectiveness in handling the testimony of Phyllis Hasty.

Petitioner further alleges that Holroyd was ineffective in the way he handled the testimony of child therapist Phyllis Hasty in three respects: (a) not objecting to her testimony that C.R. disclosed to her that Petitioner touched her privates; (b) allowing her to testify concerning statistics surrounding children who lie about sexual abuse, or are coached to provide such allegations, as well as her opinion of why children are unable to remember specific dates when abuse occurred; and (c) not securing an expert to testify regarding the limitations of play therapy. (ECF No. 1 at 19-20).  The undersigned will address each of these contentions in turn.

First, Petitioner contends that:

Trial counsel failed to object to the discrepancy between the actual court testimony of C.R. that Petitioner never sexually touched her and the testimony of Phyliss [sic] Hasty that C.R. told her Petitioner touched her between her legs.  Because the State relied on C.R.'s testimony of Petitioner's lustful disposition toward children, counsel's failure to point out inconsistencies in C.R.'s testimony versus that of Ms. Hasty becomes even more egregious.  Counsel missed a golden opportunity to call into question the reliability of one of the State's key witnesses before the jury. Even counsel admitted the importance of these inconsistencies and expressed regret in not identifying them at trial and bringing them to the attention of the jury.

(*Id.*)

Respondent asserts that this claim fails for three reasons.  First, Respondent asserts that discrepancies between witnesses' testimony is a matter of credibility that is within the province of the jury to consider, and that, while counsel may cross-examine a State witness concerning such discrepancies, counsel may not "object" to such testimony on that basis.

Second, Respondent contends that Petitioner has mischaracterized the differences in the testimony of these two witnesses.  Respondent notes that C.R. testified at trial that

Petitioner touched her on her thighs, near her privates. (ECF No. 24, Ex. 3 at 186).  She did not testify that Petitioner actually touched her privates.  (*Id*.)  Hasty offered similar testimony, stating that C.R. disclosed to her that Petitioner rubbed her between the legs "in the thigh area" and that Petitioner "touched her . . . over the top of her clothes."  (ECF No. 24 at 31-32 and Ex. 4 at 26-27).  Respondent further contends that Petitioner can show no prejudice from Holroyd's handling of this evidence.  (ECF No. 24 at 32).

Additionally, to the extent that Hasty testified concerning the alleged percentage of children who lie or provide coached testimony concerning sexual abuse, and offered her opinion concerning why such children cannot remember specific dates of abuse, Holroyd did object to that testimony as improper expert witness testimony, and the trial court sustained the objection and ordered the jury to disregard it.  Thus, as noted by Respondent, Petitioner's contention that Holroyd ineffectively "allowed" this testimony is completely inaccurate and does not support a finding of unreasonableness or prejudice to Petitioner's defense.  (ECF No. 24 at 32-33).

Respondent further contends that Hasty's opinion testimony concerning the recall of child victims concerning specific dates or time periods of abuse was not prejudicial because Petitioner was not asserting an alibi defense and Holroyd cross-examined Hasty and the victims about the vagueness and inconsistencies in their allegations, which was a matter of credibility for the jury.  Thus, Respondent contends that Holroyd's failure to object to this specific testimony was not unreasonable.  (*Id*. at 33-34).

Finally, Respondent contends that Petitioner's claim that Holroyd was ineffective because he failed to retain a defense expert witness to counter Hasty's testimony also lacks merit because it was a reasonable, strategic decision, which is not challengeable in habeas

corpus.  Respondent asserts that calling a defense expert would have done nothing to further Petitioner's defense that no sexual abuse occurred at all.  (*Id.* at 35).

Petitioner's reply asserts that "Hasty gave hearsay accounts of the alleged victims' statements during therapy, vouched for the credibility of the alleged victims' statements and testimony, and offered her opinion and statistics on the truth of the victim's accusations."  (ECF No. 26 at 10).  Petitioner further claims that Hasty offered impermissible expert testimony when she was merely called as a fact witness to testify about her treatment of two of the children.  (*Id.* at 12).

Petitioner further contends that, despite the clear impermissibility of Hasty's testimony under state evidentiary law, Holroyd did not object to it or request any curative instructions.  Petitioner's reply asserts that the state courts' decisions were an "unreasonable application" because the SCAWV unreasonably and summarily adopted the findings of the circuit court.  (*Id.* at 10-12).  However, he does not explain how those decisions were an unreasonable application of clearly established federal law as required by 28 U.S.C. § 2254(b).  Nonetheless, he concludes that:

> no reasonable attorney would make the same mistake as to allow the State to have "expert" opinion testimony without rebuttal especially testimony about such a controversial practice such as play therapy.  Trial Counsel's actions clearly allowed the State to present controversial evidence unchallenged which culminated in Petitioner's conviction.

 (*Id.* at 12-13).

The state courts found that these claims do not demonstrate a level of prejudice to establish a reasonable probability of a different outcome sufficient to support a claim of ineffective assistance of counsel in violation of the Sixth Amendment.  The undersigned agrees that the record does not establish the requisite prejudice under *Strickland*.

Upon an exhaustive review of the record, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the state courts' findings were either contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts presented in the state court proceedings. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Petitioner is not entitled to habeas corpus relief on this claim.

4.  Ineffectiveness concerning admission of defense exhibits.

Petitioner argues that Holroyd's failure to introduce Defendant's Exhibit 1 to the jury violated his constitutional right to the effective assistance of counsel. (ECF No. 1 at 20-21). However, as noted by Respondent, the Fourth Circuit has recognized that "[d]ecisions about what types of evidence to introduce are ones of trial strategy" because "attorneys [are afforded] great latitude on where they [want to] focus the jury's attention[.]" *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998). So long as trial counsel's strategic decision was not so ill-considered that it rendered the trial a "mockery of justice," claims predicated thereupon cannot establish objectively deficient performance. *Edwards v. United States*, 256 F.2d 707, 708 (D.C. Cir. 1958). (ECF No. 24 at 36).

Defendant's Exhibit 1 allegedly constituted a signed contract between Sylvia, Petitioner, and his wife, Kathy, for transfer of custody of Sylvia's children to Petitioner and Kathy. (ECF No. 24, Ex. 3 at 149-51). Holroyd cross-examined Sylvia about this alleged contract in an attempt to introduce that exhibit to the jury. (*Id.* at 146-51). However, Sylvia denied having seen the document before and denied signing it. (*Id.* at 151). Given this testimony, Holroyd determined that the exhibit would not be admissible and did not move its admission. (*Id.*) Nonetheless, Holroyd then attempted to later

introduce the exhibit during his direct examination of Kathy Jeffrey. (ECF No. 24, Ex. 4 at 64-66). However, Kathy denied seeing Sylvia sign the document. (*Id.*) Accordingly, the exhibit was not admitted into evidence. (*Id.*) However, as noted by Respondent, although Holroyd's efforts to admit the exhibit were unsuccessful, he did elicit testimony from Kathy and Petitioner that Sylvia had agreed to give them custody of her children. (*See, e.g.,* ECF No. 24, Ex. 4 at 147-48; Ex. 5 at 64-66). Thus, Respondent contends that the evidence on this issue was fully developed and presented to the jury, and Holroyd's attempts to put that evidence before the jury were not unreasonable. (ECF No. 24 at 36-37).

Petitioner contends that Holroyd had two ways to authenticate Sylvia's signature and failed to attempt either. He contends that Holroyd could have retained a handwriting expert or called lay witnesses who could verify Sylvia's signature. (ECF No. 26 at 13). Petitioner asserts that this failure was devastating to his defense that there was no criminal intent involved in his attempt to purchase the children. (*Id.*) However, under the circumstances presented, Holroyd's trial strategy to present evidence concerning the alleged custody agreement between Sylvia and Petitioner was objectively reasonable. Accordingly, Holroyd's performance was not deficient, and Petitioner was not unduly prejudiced.

Based upon an exhaustive review of the record, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the state courts' findings were either contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts presented in the state court proceedings. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Petitioner is not entitled to habeas corpus relief on this claim.

5.    Allowing other improper evidence to be presented to jury.

In the remainder of Ground 5, Petitioner contends that Holroyd committed various additional errors concerning the admission of other evidence at his trial. The undersigned will attempt to address each of these claims in turn.

### *Testimony by Bell and Long*

First, Petitioner contends that Holroyd should have objected to Christopher Bell and Cpl. Long's testimony that there was no evidence of abuse and neglect or substandard living conditions in Sylvia's home. (ECF No. 1 at 21-22). Petitioner claims that this testimony was irrelevant and prejudicial to his attempts to show that he had a "lawful" reason for purchasing the children – that being his efforts to remove them from their terrible living conditions. Petitioner further contends that Bell and Long were permitted to bolster each other's testimony, and that Long was allowed to "invade[] the province of the jury" when he testified that Petitioner had broken the law by attempting to purchase the children, which was an uncontested fact at trial. (*Id*. at 21).

Respondent addresses this claim as follows:

It is evident that Bell's testimony (DHHR's reception of, and investigation into, Petitioner's complaint) was relevant and admissible at trial because this testimony went right to the heart of why Petitioner claimed he was attempting to purchase his grandchildren. This testimony was also relevant to the defense's theme, which is why the existence of this video and the allegedly poor state of the children's living conditions was a frequent subject of Petitioner's cross-examination of the State's witnesses. (See, e.g., Ex. 5 at 69; Ex. 3 at 93). Petitioner alleged that the children were living in a bad environment—their mother was engaging in pornographic conduct on the internet and the children themselves lived in a dirty home and were neglected. (Ex. 3 at 169-70; Ex. 4 at 92-93). Petitioner used this evidence to argue that his offer to purchase the children was not borne out of his sexual desires, but was instead because he was a loving grandfather and wanted to be able to provide a better home for these children. (See, e.g., Ex. 4 at 92-93; 119). Evidence relating to these claims (the porn and the abusive, neglectful home environment) was critical to the defense. (See Ex. 5 at 70) (Defense counsel's testimony at the omnibus hearing as to this strategy).

> This evidence was also utilized by the defense to argue that Sylvia had a motivation to compel her children to fabricate allegations of sexual misconduct against Petitioner (because Sylvia wanted to get "pay back" for Petitioner using the video to make a report to DHHR). (Ex. 4 at 69) (Kathy's testimony that "she [Sylvia] got mad at us because he [Petitioner] turned the CD over to the state troopers."); (Id. at 86-97) (Petitioner's testimony).

(ECF No. 24 at 39).

### *Other bad acts evidence*

Petitioner also claims that Holroyd was ineffective because he failed to object to the admission of "other bad acts" evidence concerning sexual abuse of A.P. that allegedly occurred in Tennessee rather than West Virginia. Specifically, Petitioner contends that the State was permitted, without any challenge, to present testimony from A.P. that Petitioner touched her breasts while they were in Tennessee and Hasty's testimony confirmed that allegation. (*Id.*) Petitioner further claims that Holroyd ineffectively failed to object to the State's assertion that Petitioner had a lustful disposition towards children. (*Id.*)

Concerning this evidence, Respondent asserts:

> Assuming Petitioner's claim is that his counsel was ineffective for failing to obtain the exclusion of the Rule 404(b) evidence outlined above, that claim fails. The circuit court provided a limiting instruction when the State introduced its 404(b) evidence and, on direct appeal, the SCAWV found that the admission of this evidence was proper. *State v. Mark Lynn J.*, 2013 WL 3185087 at *2 (referring to the 404(b) evidence, "[w]e believe the trial court admitted the challenged evidence for a proper purpose and it was relevant. At trial, petitioner disavowed any criminal intent in attempting to purchase his granddaughters and stated he made the offer to give them a better life. The State sought to demonstrate petitioner's motive and the absence of mistake by showing petitioner's prior acts of sexual advances toward C.R. In addition to the clear and unambiguous language of Rule 404(b), our previous cases recognize the probative value of uncharged acts to demonstrate 'intent' and 'absence of mistake or accident.'") (citations omitted). Because this evidence was admissible at trial, trial counsel could not have been constitutionally deficient in failing to move to have it excluded.

28

(*Id.*)

### *Testimony of Sgt. Clemons and opening door to substance of victim interviews*

Petitioner further asserts that Holroyd failed to object to the alleged presentation of "expert" testimony by Sgt. Clemons and allowed the admission of substantive evidence from the children's forensic interviews due to his "clumsy" questioning of Petitioner on direct examination.

Respondent contends that this claim is "factually misplaced" because Clemons testified concerning how the forensic interviews were arranged and where they took place, but did not offer specific testimony regarding the substance of the alleged victims' disclosures in those interviews.  (ECF No. 24 at 45-46 and Ex. 3 at 221-223).  The Response further states:

> Nonetheless, the claim still fails because Petitioner's counsel testified that the defense strategy was not built around an alibi defense or challenging the number of times the abuse occurred; instead, the defense at trial was that the abuse never happened in the first place. (See Ex. 5 at 60-63). Accordingly, Sgt. Clemons' testimony (and, as discussed herein, Therapist Hasty's testimony) had no bearing on the defense strategy.  For these reasons, it stands to reason that Defense counsel's "failure" to object to Sgt. Clemons' testimony was a strategic decision because her testimony did not "move the ball" from the defense perspective. *See generally Schauer v. McKee*, 401 F. App'x 97, 101 (6th Cir. 2010); *Bullock v. Carver*, 297 F.3d 1036, 1047 (10th Cir. 2002) (observing that counsel's trial performance carries with it a presumption that "defense counsel's actions were sound trial strategy"). Consequently, counsel's performance in "failing to object" to this evidence was not objectively unreasonable. Inasmuch as Petitioner challenges the introduction of some other "substantive" evidence from the forensic interviews, as outlined above, Petitioner faces a high legal burden in establishing both the factual and legal validity of his claims.   His failure to outline this claim sufficient[ly] does not satisfy his burden.

(*Id.* at 45-46).

Petitioner further contends that Holroyd's direct examination of Petitioner during the trial "opened the door" to the admission of evidence concerning the substance of the victims' forensic interviews. However, the petition does not to elaborate on this claim.

Respondent contends that Petitioner fails to meet his burden of demonstrating any right to relief on this claim. His response states:

> Petitioner claimed at trial that A.P. was paid to report the sexual abuse. (Ex. 4 at 97). His counsel asked a reasonable follow-up to that question by asking Petitioner to expound upon this claim. (Id.). Petitioner testified that he knew A.P. was paid "[b]ecause I read it in the [forensic] interview she had with Shilod Woodard. Page 26 and 27." (Id.). On cross-examination, the prosecutor reviewed this interview with Petitioner, forcing him to concede that the interview made no such reference to A.P. being paid. (Ex. 4 at 103-05). Trial counsel objected to the prosecutor's use of the interview, but the court over-ruled that objection on the basis that Petitioner's testimony opened the door to the admission of that evidence. (Id. at 101-02). Petitioner's contention that his counsel opened this door by "clumsily questioning Petitioner on the witness stand" is absurd. Petitioner claimed that A.P. was paid to falsify the sexual abuse. His counsel asked Petitioner to explain how he knew A.P. was paid to lie and his answer—that it said so in the forensic report—opened up the evidentiary door. This was Petitioner's own ridiculous testimony—lying about what a written report said—and was not borne of trial counsel's "clumsy" questioning. Counsel's question was a reasonable question to ask and, therefore, counsel's performance was not objectively unreasonable. Accordingly, Petitioner's claim fails. [Footnote omitted].

(ECF No. 24 at 47).

### *Reference to first trial and Petitioner's prior foot injury*

Ground 5 of Petitioner's § 2254 petition also asserts that Holroyd provided ineffective assistance because he made a reference to Petitioner's first trial in front of the jury, and further permitted the prosecutor to comment about Petitioner's prior use of a wheelchair, due to an injury. The petition summarily asserts:

> Trial counsel also referenced the first trial which could only infer to the jury that he had not won the first trial and allowed the Prosecutor to make impermissible comments to the jury regarding Petitioner['s] foot injury requiring him to use a wheelchair.

(ECF No. 1 at 21-22).  However, Petitioner does not pinpoint where in the trial these matters occurred or explain how such evidence prejudiced the outcome of his trial.

Respondent answers these claims as follows:

Petitioner argues that his trial counsel was ineffective for referencing the fact that Petitioner had been tried before. (ECF 1 at 21).  This claim is without merit.  In fact, Petitioner's trial counsel used the transcript of the first trial to impeach witnesses who gave conflicting testimony during Petitioner's first trial. (See, e.g., Ex. 4 at 32-33).  This was a thought-out, anticipated trial strategy and counsel laid the foundation for this strategy as early as voir dire:

DEFENSE COUNSEL:  There will be questions of witnesses where prior testimony has been taken from those witnesses and it will be compared, probably, with testimony that is being given here today. Will anyone in this jury have any difficulty separating out those two incidences where testimony was given at a prior time that may be somewhat inconsistent with the testimony that is given here today?  (Ex. 3 at 25).

Moreover, as Petitioner's counsel explained during the state court omnibus hearing, it was advantageous to have a rubric to use in the second trial (particularly where the same defense strategy resulted in a mistrial at the first trial.). (Ex. 5 at 72). Given that this was a reasoned and intelligent strategy to use at trial, counsel's reference to the existence of this previous testimony was not objectively unreasonable.  Thus, Petitioner's claims fail.

(ECF No. 24 at 47-48).  Thus, Holroyd referenced "prior testimony," but did not state that it was offered in a "prior trial."

With respect to Petitioner's prior injury reference, at a pre-trial hearing, Petitioner appeared in a wheelchair due to a medical condition involving his foot. (ECF No. 24, Ex. 2 at 3).  During trial, the prosecutor asked Petitioner questions about medical care for which he would travel from Tennessee to West Virginia to receive.  He asked Petitioner whether he still needed a wheelchair and Petitioner said "no." (ECF No. 24, Ex. 4 at 115-16).  Respondent asserts that there was no reason for Holroyd to object to this question because it had no effect on his guilt or innocence and Petitioner cannot demonstrate that it affected the outcome of his trial.  (ECF No. 24 at 48).  Accordingly, Respondent

contends that, even if Holroyd's conduct was objectively unreasonable, Petitioner was not prejudiced thereby. (*Id.* at 48-49).

With respect to each of these claims, Petitioner's reply essentially reiterates the arguments contained in his petition and adds nothing new. (ECF No. 26 at 15-16).

Based upon an exhaustive review of the evidence of record, the undersigned **FINDS** that Holroyd's conduct surrounding the presentation and admission of all of this evidence during the trial did not fall below an objective standard of reasonableness and did not result in any undue prejudice to Petitioner's defense. Therefore, he cannot establish that Holroyd provided ineffective assistance of counsel in violation of Petitioner's Sixth Amendment rights.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the state courts' findings were contrary to, or an unreasonable application of, clearly established federal law, or that such decisions were based upon an unreasonable determination of the facts presented in the state court proceedings. Thus, the undersigned further proposes that the presiding District Judge **FIND** that Petitioner is not entitled to habeas corpus relief on any of his claims of ineffective assistance of counsel asserted in Ground 5 of his § 2254 petition.

**B.     Ground 6 – Cumulative error.**

In Ground 6 of his § 2254 petition, Petitioner asserts that the cumulative effect of various alleged errors raised in his petition resulted in the violation of his right to a fair trial that should result in the reversal of his convictions. Specifically, his petition states:

> In the case at bar, numerous errors were committed by the Court, the State, and Trial Counsel that caused Petitioner to be convicted. The significant number of errors in Petitioner's case warrant a finding that the proceedings were unfair and violated his constitutional rights to a fair trial. When one views the substantial amount of errors committed in the trial of Petitioner,

> the fairness of the proceedings becomes crystal clear.  Petitioner's trial was plagued by errors of constitutional significance and prejudice to his case cannot be denied.

(ECF No. 1 at 22).

Respondent contends that "cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).  Respondent nevertheless claims that Petitioner's cumulative error claim fails because he has not actually established any errors of a constitutional dimension that occurred at his trial.  (ECF No. 24 at 49).

In *Fisher v. Angeleone*, 163 F.3d 835, 852 (4th Cir. 1998), the Fourth Circuit held that "legitimate cumulative-error analysis evaluates only the effect of matters <u>actually determined to be constitutional error</u>...." [Emphasis added]. Thus, in order for a cumulative error analysis to apply, the court must first find that there have been actual constitutional errors.  Petitioner's claim of cumulative error stems from claims which the court has previously found to be non-errors. Because the court has already found that there were no violations of Petitioner's constitutional rights, to the extent that Petitioner raises (as a basis for cumulative error) claims already addressed by the court, his claim of cumulative error lack merit as well.

Accordingly, based upon an exhaustive review of the evidence of record, the undersigned proposes that the presiding District Judge **FIND** that Petitioner was not denied a fair and impartial trial based on the cumulative effect of any alleged errors asserted by him in his federal petition, and that the state courts' decisions denying Petitioner habeas corpus relief on this basis were neither contrary to, nor an unreasonable application of, clearly established federal law, or an unreasonable application of the facts presented in the state court proceedings.  Therefore, the undersigned further proposes

that the presiding District Judge **FIND** that Petitioner is not entitled to relief on Ground 6 of his § 2254 petition.

## **RECOMMENDATION**

For all of the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** Petitioner's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1) and **DISMISS** this civil action from the docket of the court.

The parties are notified that this Proposed Findings and Recommendations is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals.  *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce,* 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on the opposing party and Judge Faber.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy to the petitioner, and to transmit a copy to counsel of record.

June 17, 2020

Dwane L. Tinsley
United States Magistrate Judge